UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BASHIR MOHAMED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.:  2:20-cv-02044-JHE |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION[1]**

Plaintiff Bashir Mohamed ("Mohamed") seeks review, pursuant to 42 U.S.C. § 405(g) and § 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying his applications for a period of disability and disability insurance benefits ("DIB"). (Doc. 1). Mohamed timely pursued and exhausted his administrative remedies. This case is therefore ripe for review under 42 U.S.C. § 405(g). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **REVERSED AND REMANDED**.

**I. Factual and Procedural History**

On October 30, 2018, Mohamed filed an application for a period of disability and disability insurance benefits ("DIB") alleging disability beginning on October 4, 2018. (Tr. 9). The Commissioner initially denied Mohamed's claim on December 21, 2018. (*Id.*). Rather than

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties in this case have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 14).

appealing that denial, Mohamed filed a new application on May 3, 2019.  (Tr. 93).  The Commissioner also denied the second application at the initial level on July 1, 2019.[2]  (*Id.*).

This time, Mohamed timely requested a hearing before an Administrative Law Judge ("ALJ").  Following a hearing on April 21, 2020, and a supplemental hearing on September 1, 2020, the ALJ entered an unfavorable decision denying Mohamed's application for benefits in a decision dated September 9, 2020.  (Tr. 12).  Mohamed sought review by the Appeals Council, but it denied his request for review on December 3, 2020.  (Tr. 1-6).  On that date, the ALJ's decision became the final decision of the Commissioner.  On December 21, 2020, Mohamed initiated this action.  (Doc. 1).

Mohamed was 37 years old on his alleged onset date.  (Tr. 69).  He has a limited education and past relevant work experience as a convenience store clerk and retail manager.  (Tr. 233-34).  Mohamed alleges he cannot work because he experiences seizures, which are the result of a gunshot wound to his head that occurred when he was a child and the resulting traumatic brain injury.  (Tr. 232).

## II. Standard of Review[3]

The court's review of the Commissioner's decision is narrowly circumscribed.  The function of this Court is to determine whether the decision of the Commissioner is supported by

---

[2] According to 20 C.F.R. § 404.988, Mohamed's October 30, 2018, application should be reopened. That regulation provides that if a new application is filed within 12 months of the initial determination of a prior application, the prior application should be reopened "for any reason." *Id.*

[3] In general, the legal standards applied are the same whether a claimant seeks Supplemental Security Income ("SSI") or DIB. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This Court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to

---

[4] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of April 1, 2007.

disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;
(2) whether the claimant has a severe impairment;
(3) whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];
(4) whether the claimant can perform his or her past work; and
(5) whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job." *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show such work exists in the national economy in significant numbers. *Id.*

### IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

At Step One, the ALJ found Mohamed had not engaged in substantial gainful activity since his alleged onset date, October 14, 2018. (Tr. 17). The ALJ noted that Mohamed did work after the alleged disability onset date, but that this work did not rise to the level of "substantial gainful

4

activity." (*Id.*). "Substantial gainful activity" for 2018 was $1,180.00 per month. For the fourth quarter of 2018, Mohamed reported earning $1,120.00. (*Id.*). In 2019, the "substantial gainful activity" threshold was $1,260.00. (Tr. 17-18). In 2019, Mohamed reported an average monthly income of $1,083.33. (*Id.*). At the hearing in 2020, Mohamed testified he works the same job, but only four hours a day – still below the substantial gainful activity threshold. (Tr. 18).

At Step Two, the ALJ determined Mohamed had the following severe impairment: seizure disorder status post gunshot wound below the right eye. (Tr. 18). At Step Three, the ALJ found Mohamed does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).

Before proceeding to Step Four, the ALJ determined Mohamed's residual functioning capacity ("RFC"), which is the most a claimant can do despite his impairments. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ determined Mohamed has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: as a part of the job requirements is unable to climb ladders, ropes, or scaffolds, but can frequently climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; and cannot perform around hazards, or in concentrated exposure to extreme hot or cold temperatures, or fumes, odors, dust, gases, poor ventilation, etc. (Tr. 18-22).

Combining Steps Four and Five, relying in part on testimony from a vocational expert ("VE"), the ALJ determined Mohamed was able to perform his past relevant work as a convenience store clerk; however, as a retail store manager, he could only perform it as it is performed in the national economy. (Tr. 22). The ALJ found Mohamed had performed the convenience store clerk job long enough to perform it adequately and at a substantial gainful level. (*Id.*).

Therefore, the ALJ determined Mohamed has not been under a disability from October 14, 2018, and denied his claim. (Tr. 25).

## V. Analysis

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or because improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Williams*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Mohamed challenges the Commissioner's denial of benefits on two distinct grounds. (Doc. 16 at 3). First, Mohamed contends the ALJ did not give appropriate weight to the opinions of his treating neurologist, Dr. Sandipan Pati, and therefore erred in finding that Mohamed did not meet Listing 11.02 for epilepsy. (*Id.*). Second, Mohamed asserts that the ALJ improperly rejected his subjective testimony and failed to follow Social Security Ruling 16-3p. (*Id.*).

### A. Dr. Pati's May 4, 2020 Statement and Listing 11.02 for Epilepsy

The ALJ acknowledged that Dr. Pati completed a form on May 4, 2020, stating that Mohamed meets the criteria of Listing 11.02 for epilepsy because, on average, Mohamed has 1-2 generalized tonic-clonic seizures[5] per month despite treatment and noting that Mohamed was under evaluation for epilepsy surgery. (Tr. 21). The ALJ found this statement not persuasive because, according to the ALJ, it was not supported by Dr. Pati's own medical records as well as the absence of medical compliance in other records (2F and 4F). (*Id.*). The ALJ explained the opinion was not persuasive as to Mohamed meeting Listing 11.02 for epilepsy because of

---

[5] A tonic-clonic seizure, also called a grand mal seizure, is a type of seizure that involves loss of consciousness and violent muscle contractions.

Mohamed's non-compliance with his prescribed treatment regiment, his ongoing part-time work activity, the statement in the record that the seizure activity occurs from sleep, and the absence of a clear event on the EEG, despite no medication prior to the study. (*Id.*). Thus, the ALJ found Mohamed's seizures were not of the severity of a listing-level impairment. (*Id.*).

Mohamed contends that it is undisputed he suffered a gunshot wound to his head as a child living in Yemen, and that, as the result of this traumatic brain injury, Mohamed developed a seizure disorder. (Doc. 17 at 5). According to Mohamed, he subsequently moved to the United States and worked for many years in California. (*Id.* at 6). During this time, Mohamed's seizures were controlled with medication. (*Id.*). However, due to financial reasons, Mohamed had to move to Alabama and was thereafter unable to afford any type of treatment for his seizures, including medication. (*Id.*). When, in 2018, the seizures began to worsen, Mohamed began seeing a neurologist at UAB, Dr. Sandipan Pati. (*Id.*). (Tr. 352). At the initial visit, Dr. Pati prescribed Mohamed seizure medications, but despite taking his medications as prescribed, Mohamed continued to experience one to two seizures per month. (Tr. 348, 364, 361, 358, 355).

**1. New Regulations for Medical Source Opinions**

For claims filed on for after March 27, 2017, statements from a medical source reflecting judgments about a claimant's diagnosis, prognosis, or symptoms, as well as statements that reflect the nature and severity of a claimant's impairment(s) are not considered medical opinions because they do not necessarily provide perspectives about the claimant's functional abilities and limitations. 20 C.F.R. §§ 404.1513(a)(2), (3), 416.913(a)(2), (3) (2017);[6] *see* 81 Fed. Reg. at 62,562.

---

[6] By contrast, the prior regulations and the regulations that apply to claims filed before

For these claims filed on or after March 27, 2017, the regulations contain a more focused definition of medical opinion:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2017).

Additionally, for claims filed on or after March 27, 2017, the new regulatory scheme no longer requires the ALJ to either assign more weight to medical opinions from a claimant's treating source or explain why good cause exists to disregard the treating source's opinion. *See* 20 C.F.R. § 404.1520c. Under the new regulations, an ALJ should focus on the persuasiveness of medical opinions and prior administrative medical findings by looking at five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. *Id.* § 404.1520c(c)(1)–(5); *see Matos v. Comm'r of Soc. Sec.*, No. 21-11764, 2022 WL 97144, *4 (11th

---

March 27, 2017, provide that statements from an acceptable medical source that reflect judgments about the nature and severity of a claimant's impairment(s), including the claimant's symptoms, diagnosis, and prognosis, are considered "medical opinions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2016); *id.* at §§ 404.1527(a)(1), 416.927(a)(1) (2017).

Cir. Jan. 10, 2022); *see also Harner v. SSA, Commr.*, No. 21-12148 (11th Cir. June 27, 2022) (holding that the new regulation validly abrogated the treating physician rule).

The ALJ may, but is not required to, explain how she considered factors other than supportability and consistency, which are the most important factors. *Id.* § 404.1520c(b) "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). And "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

Furthermore, these new regulations deem statements on issues reserved to the Commissioner – including statements about whether a claimant's impairment meets or medically equals any listing – as evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. §§ 404.1520b(c)(1)-(3), 416.920b(c)(1)-(3) (2017). The regulations thus make clear that, for claims filed on or after March 27, 2017, "we will not provide any analysis about how we considered such evidence in our determination or decision." 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

**2. Analysis**

The Commissioner contends that although the ALJ technically erred when he incorrectly addressed the supportability and consistency of Dr. Pati's statement on an issue reserved to the Commissioner as if evaluating a medical opinion, such error was harmless because it did not impact the outcome of the case. (Doc. 18 at 13). While this may be true, it is not the end of the

9

discussion. Even if the ALJ was not required to explain his evaluation of Dr. Pati's statement, the ALJ's related finding that Mohamed did not meet Listing 11.02 for epilepsy must be supported by substantial evidence.

Listing 11.02 for epilepsy provides it is met when "documented by a detailed description of a typical seizure and . . . A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)." Listing 11.02A, Appendix I to Subpart P of Part 404.

The ALJ provided four main reasons for finding Dr. Pati's statement unpersuasive and that Mohamed did not meet Listing 11.02. (Tr. 21). Specifically, the ALJ pointed to (1) noncompliance with prescribed treatment; (2) contended that Dr. Pati's statement was not supported by his own medical records; (3) referenced Mohamed's ongoing part-time work; and (4) highlighted the absence of a clear event (presumably a seizure) recorded on EEG. (Tr. 21). However, upon closer examination, none of these reasons are supported by the record.

Although Mohamed had not taken seizure medication for some years prior to 2018, the records include only a single concrete instance of arguable noncompliance during the relevant period. Specifically, Mohamed failed to take two doses of seizure medication just prior to undergoing a 24-hour EEG at the University of Alabama at Birmingham ("UAB") Hospital. (Tr. 369-70). The ALJ cited this example at the hearing as a "very big issue about medical compliance." (Tr. 36). However, Mohamed reported he thought he had been *instructed* to skip those doses prior to admission. (Tr. 370). In other words, rather than being noncompliant, Mohamed was trying (albeit mistakenly) to follow his physicians' instructions. The notes from this visit report that Mohamed was otherwise compliant with taking his medication (tr. 371), and the records the ALJ cites contain no further instances of noncompliance with medication apart

10

from, arguably, the two-year period when Mohamed was off medication. (*See, e.g.,* tr. 348). However, the treatment notes referencing this period indicated Mohamed moved from California (where his doctor had prescribed medications) to Birmingham for "financial reasons," after which he "ran out of meds and was having 2-3 szs/mo but was OFF meds for 2 years." (Tr. 348). To the extent the ALJ considered this period an example of noncompliance, the ALJ erroneously did not appear to take into account the possible (perhaps even likely, given the context) financial reason for Mohamed's lack of medication during this time period. *See* SSR 16-3P ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."); *Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir.1988) ("poverty excuses [a claimant's] noncompliance" with medical treatment).

It is also unclear how the Commissioner believes Dr. Pati's records conflict with the finding that Mohamed meets Listing 11.02A, and the ALJ did not elaborate on this claim. To the contrary, Dr. Pati's records uniformly indicate Mohamed experiences seizures every other week or one or two times per month. (Tr. 348, 364, 361, 358, 355). Furthermore, the fact that they happen in his sleep does not mean they are controlled or do not impact his life. Records indicate that the seizure medication makes Mohamed drowsy (tr. 358, 361-62), and he falls asleep during the day. Records from 2019 indicate that, after a seizure, paramedics wanted to take Mohamed to the hospital, but he did not go because he did not have medical insurance. (Tr. 348).

Furthermore, it is equally unclear how the fact Mohamed has been able to work part-time, below the substantial gainful activity ("SGA") threshold, supports the ALJ's finding. A claimant who is not currently engaging in SGA and who has a severe impairment which meets or equals a Listing is entitled to disability benefits. *Edwards v. Heckler*, 736 F.2d 625, 628 (11th Cir. 1984).

Accordingly, the fact Mohamed engaged in part-time work that failed to rise to the level of SGA does not undermine the severity of his seizures.

The ALJ's fourth reason, the absence of a clear event on EEG, is also suspect. Although the EEG did not capture "one of Mr. Mohamed's normal spells" (tr. 370), Mohamed's EEG was not uneventful. To the contrary, it showed "frequent right posterior temporal spike and wave complexes at T10 and P10>T4 . . . consistent with his history of [gunshot wound] with right posterior temporal exit wound and suggestive of focal epilepsy." (Tr. 370). Although the test may have been more persuasive had it captured a clear EEG event, there is no requirement in the Listing that a claimant undergo an EEG or present ironclad EEG-based evidence of a seizure. *See* Preamble to Neurological Listings §11.00(H)(5).

Even if the ALJ was not required to address or consider Dr. Pati's May 4, 2020, statement because it was not a "medical opinion" or because it addresses an issue reserved to the Commissioner, the ALJ still must support each finding with substantial evidence. The four inaccuracies described above call into question whether there is substantial evidence to support the ALJ's finding that Mohamed did not meet Listing 11.02A.

The Commissioner's argument that Mohamed did not meet his burden because he "failed to provide any description from someone—preferably a medical professional—who had ever witnessed a seizure;" and, because there is no documentation by any third party as to the nature or frequency of his seizures (doc. 18 at 14), is also without merit. First, although the ALJ cited the absence of observation by a medical professional of Mohamed's seizures, the sole instance record instance where observation would be expected was the 24-hour period where Mohamed underwent the EEG. As noted above, the EEG was consistent with focal epilepsy, even if it did not directly reveal a seizure.

Second (although this was not before the ALJ when he rendered his decision), Mohamed's counsel submitted a declaration to the Appeals Council from Mohamed's son in which the son describes Mohamed's seizures and confirmed his father was compliant with medical treatment. (Tr. 344). The Appeals Council exhibited this Declaration, but made no findings as to its materiality. (Tr. 12). "With a few exceptions, the claimant is allowed to present new evidence at each stage of this administrative process," including before the Appeals Council. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1261 (11th Cir. 2007) (citing 20 C.F.R. 404.900(b)). The Appeals Council must review a case if it receives additional evidence that is new, material, and chronologically relevant. 20 C.F.R. § 404.970(a)(5); *Ingram*, 496 F.3d at 1261. "[W]hether evidence meets the new, material, and chronologically relevant standard is a question of law subject to . . . *de novo* review," and an erroneous failure to consider such evidence warrants remand. *Washington v. Soc. Sec. Admin., Com'r*, 806 F.3d 1317, 1321 (11th Cir. 2015). The son's declaration was clearly new and appears chronologically relevant. To the extent the Commissioner now argues the absence of a third-party report of a seizure was substantial evidence supporting the Commissioner's decision, the Commissioner effectively concedes the declaration was material. *See Hargress v. Soc. Sec. Admin., Comm'r*, 874 F.3d 1284, 1290-91 (11th Cir. 2017) (for evidence to be material, there must be a reasonable possibility that the evidence would change the administrative outcome). Accordingly, accepting the Commissioner's argument, remand would be appropriate in any case to assess the son's declaration.

On remand, in light of the foregoing, the Commissioner should reconsider whether Mohamed's impairments meet or equal Listing 11.02A or any other relevant Listing.

**B. Mohamed's Subjective Complaints**

The Eleventh Circuit "has established a three part 'pain standard' that applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Subjective testimony supported by medical evidence satisfying the standard is sufficient to support a finding of disability. *Id.* However, the ALJ may still make a credibility determination on the claimant's statements about the intensity and effect of that pain. *See Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995); *Hogard v. Sullivan*, 733 F. Supp. 1465, 1469 (M.D. Fla. 1990). The ALJ's adverse credibility determination must be supported by "explicit and adequate reasons," *Holt*, 921 F.2d at 1223, and substantial evidence, *see Foote*, 67 F.3d at 1561-62. An ALJ's clearly articulated credibility determination will not be disturbed if supported by substantial evidence. *Petteway v. Comm'r of Soc. Sec.*, 353 F. App'x 287, 288 (11th Cir. 2009).

When evaluating the credibility of a claimant's statements regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ considers all evidence, objective and subjective. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 364186 at * 4-5. The ALJ may consider the nature of a claimant's symptoms, the effectiveness of medication, a claimant's method of treatment, a claimant's activities, and any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3), (4); SSR 96-7p, 1996 WL 364186 at * 4-8. If an ALJ discredits a claimant's subjective complaints, "he must articulate explicit and adequate reasons for doing so." *Wilson v. Comm'r of Soc. Sec.*, 284 F.3d 1219, 1225

14

(11th Cir. 2002). "[I]f a credibility determination is inadequate, a remand to the agency for further consideration is the proper remedy." *Carpenter v. Astrue*, No. 8:10-CV-290-T-TGW, 2011 WL 767652 (M.D. Fla. Feb. 25, 2011). *See also Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 835 (11th Cir. 2011) (retreating from *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986), based on the prior precedent rule, and remanding to the agency).

Here, the ALJ discounted Mohamed's testimony because his subjective complaints were not entirely consistent with the evidence of record:

> The claimant alleges an inability to work due to chronic seizures... A review of the evidence shows a history of treatment for these impairments. However, the claimant's statements concerning the intensity, persistence and limiting effects of these impairments are not consistent with the objective medical evidence. The claimant alleges debilitating symptomatology and limitations associated with his alleged impairments, yet the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment. The description of the symptoms and limitations, which the claimant has provided throughout the record, has generally been inconsistent and unpersuasive. While it is reasonable that the claimant may experience some symptoms that would cause some exertional and non-exertional limitations, the objective medical evidence does not support a complete inability to work.

(Tr. 19-20; *see also* tr. 18-22).

The ALJ's reliance on the unsupported reasons discussed above, as well as others, undermines his evaluation of Mohamed's subjective complaints. For example, the ALJ explicitly cited noncompliance and the fact that the frequency of Mohamed's seizures improved with treatment as reasons he discounted his subjective complaints. (Tr. 20). As explained above, there is no relevant evidence of noncompliance. Additionally, the record does not show that Mohamed's seizures improved with treatment. Instead, the medical records indicate that Mohamed had been taking three seizure medications since he started seeing Dr. Pati in October 2018, but they were not effective at controlling his seizures. (Tr. 372, 377). To the extent the ALJ relied on the fact

15

that Mohamed only received "routine" treatment (*see* tr. 20), it is repeatedly noted throughout the record that Mohamed did not have medical insurance and that lack of insurance or other financial resources was the reason he had not received additional treatment or imaging. (Tr. 349, 354-55, 363). The assertion that routine care controlled Mohamed's seizures is further undermined by the fact that the February 2020 hospital admission/EEG study was ordered because outpatient therapy had "failed." (Tr. 372). Finally, while the ALJ focuses on the fact no "event" or seizure was captured during his EEG, records indicate that "[h]is EEG showed frequent right posterior temporal spike and waves complexes at T10 and P10>T4, which is consistent with his history of GSW [gun shot wound] with right posterior temporal exit wound and suggestive of focal epilepsy." (Tr. 370).

On remand, the ALJ should reevaluate Mohamed's subjective complaints consistent with this opinion.

### VI. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security denying Mohamed's claim for a period of disability and disability insurance benefits is **REVERSED AND REMANDED**. A separate order will be entered.

DONE this 29th day of September, 2022.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE